## The New Boston Coal and Mining Company *versus* The Pottsville Water Company.

1. Preliminary injunction for nuisance in fouling water, must stand or fall on the merits it possessed at the granting of the injunction.

2. An injunction is always a high exercise of power to be very cautiously exerted, but where large and expensive works are sought to be stopped for something incident to a lawful employment and not on account of direct or wilful encroachment, it should clearly appear that it is a case for equitable intervention; that there is no adequate remedy at law and that irreparable injury will ensue.

3. There must be a clear necessity for the intervention in the light of inability to be compensated for the wrong.

4. A water company filed a bill for injunction against a mining company who had erected works at great expense, to restrain them from polluting the water by drainage from their mines. The evidence not being clear that any

[New Boston Coal and Mining Co. *v.* Pottsville Water Co.]

pollution had actually occurred to the water when it was used, the injunction was refused.

January 24th and 25th 1867. Before WOODWARD, C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

Appeal from the decree of the Court of Common Pleas of *Schuylkill county.* In Equity.

This was a bill in equity filed in February 1866 by The Pottsville Water Company against The New Boston Coal and Mining Company and George Potts.

The bill alleges the incorporation of the plaintiffs in 1834, and that by a supplement of February 18th 1854, they were authorized to bring into Pottsville fresh and pure water from Mill creek or any of its branches, with power to hold land, &c., &c. ; and also to supply the towns of St. Clair, Port Carbon, Palo Alto and Mount Carbon, for domestic and manufacturing purposes and for stationary and locomotive engines, and that it was made penal " wilfully to corrupt or permit anything to run or fall into any stream from which the said company shall take water to be introduced into the borough of Pottsville, which shall tend to corrupt the same, or to render it unpalatable, unwholesome or unfit for domestic or manufacturing use, or for the supply of stationary or locomotive engines" ; that the company had expended $130,000 in constructing their works, laying pipes, &c., and had been supplying water for ten years ; that up to 1854 they supplied water from springs near Pottsville on Sharp Mountain, and the water becoming polluted by washings, dirt, &c., from coal-mines there, they entered upon land on Broad Mountain and erected there a dam, &c., at considerable cost, to secure the waters of Mill creek, and have, from 1859, maintained a costly line of water-pipes from this dam to Pottsville, a distance of five miles ; that the defendants had for six months been engaged in opening coal-mines by a large slope on Broad Mountain, near the head waters of Mill creek ; that in sinking the slope, large underground currents, impregnated with sulphur, &c., and making a compound which is unpalatable, unwholesome and corrupt, and which runs into Mill creek above the plaintiffs' dam, " and thereby not only tends to corrrupt, but does corrupt the waters of said Mill creek, which flow into said dam and thence into the line of water-pipes of the complainant. It destroys the purity of said water ; has a tendency to corrode, and eat into and perforate the iron water-pipes and the boilers of the locomotives and stationary engines, and to render the water unpalatable, unwholesome and unfit for domestic or manufacturing purposes" ; that the defendants threaten to open a large colliery, which will largely increase the discharge of the impure water and greatly increase and aggravate the injury to the waters of Mill creek; that they have deposited coal, coal-dirt and other debris at the top of the slope, which, in

the ordinary working of the colliery, must be greatly increased, and that the rain and other washings will carry these impurities into Mill creek, clogging the pipes of the plaintiffs and corrupting the water; that notice of these evils was given to the defendants as early as June 23d 1865.

The complainants asked for equitable relief—

1. That it may be decreed that the defendants have no right to cause and permit the water, taken from said slope, to flow into Mill creek above the dam of the complainants.

2. That they have no right to make deposits of coal, coal-dirt, slate and other debris, so that the falling rains or other washings shall cause the same to be carried into Mill creek above the dam of the complainants.

3. That an injunction, special till hearing and perpetual thereafter, may be issued to restrain the defendants from causing or permitting the water taken from their slope to flow into Mill creek above the dam of the complainants, and also to restrain the defendants from depositing coal, coal-dirt, slate and other debris, so that the falling rains or other washings shall cause the same to be carried into Mill creek above the dam of the complainants.

Such further and other relief as to the court may seem meet.

The defendants answered that they were owners of 1200 acres of land in the New Boston Anthracite Basin, valuable only for the coal they contain, worth $1,000,000; known to the plaintiffs as such before putting in their water-pipe; that in 1852 the then owners erected an engine, sunk a shaft and pumped water, which was before the plaintiffs made any movement to appropriate the water of Mill creek; that the improvements of the then owners cost above $100,000; that it is necessary to drain the mines through the whole of this coal-field, otherwise the coal cannot be mined and taken away; that the water thus drained flows into the natural channels tributary to the Schuylkill, Mill creek being one, and this is the uniform and only method of discharging the water; that its natural passage into Mill creek is five miles above the commencement of the plaintiffs' pipe and their dam could not have cost above $5; that the defendants have expended above $250,000, and if they should be stopped, this sum with the land must be rendered of no value and the works and mines lost for ever; that they claim no right to put any dirt, &c., in such position as that they will be taken into Mill creek, that the mine water is pure and free from acid and nauseous matter, and does not affect the wholesome qualities of Mill creek; that the complainants take the main supply of water from Wolf creek, a tributary on which there are no coal-mines, and by little effort can preserve the water pure and wholesome; the defendants further say that they do not intend to do anything to affect the plaintiffs' interest, but to work their collieries in the most prudent manner, but they own the land and

[New Boston Coal and Mining Co. *v.* Pottsville Water Co.]

have a "legal and natural right" to mine, &c., and are not responsible for the usual and natural flow of the water by the usual and only mode of conducting their collieries; that the plaintiffs have only the right of the water subject to the prior rights of the defendants to use Mill creek for a drain from their lands; the defendants also denied that they were notified that the evils complained of by the plaintiffs would result from their mining.

Affidavits were taken: those on the part of the plaintiffs testifying that water from such a colliery was not so injurious when first opened as it would become afterwards, and the longer it is worked it becomes more injurious; that the water is unfit for drinking or for boilers; and water percolating through debris from such mines would be equally injurious, and that the water from defendants' mines would not be relieved from the deleterious qualities in the distance from the mines to the plaintiffs' water-pipes; that the water had not affected boilers in which it was used, but that since September 1865 the water left a reddish stain which it had not done before. For the defendants it was testified that fish in full life were found in Mill creek above the pool. Booth & Garrett made an analysis of the water and found that above the defendants' slope there were 1.66 grains of solid matter to the gallon, principally silicious; at the slope 6.34 grains per gallon, consisting chiefly of sulphates of iron, lime and magnesia. The same chemists furnished a sworn certificate, dated September 25th 1866, from which the following are extracts:—

|  | Grains of solid matter per gallon. |
|---|---|
| "Average of Thames water, London   .   .   . | 20 |
| Schuylkill river, at Schuylkill Haven   .   .   . | 18 |
| Schuylkill river, at Philadelphia   .   .   .   . | 7 |
| Delaware river, at Philadelphia   .   .   .   . | $3\frac{1}{2}$ |
| Company's water, at dam, Mill creek   .   .   . | $2\frac{1}{3}$ |

"The table shows clearly that in quantity of solid matter per gallon, the Pottsville Company's water, where it enters their pipes from the Mill creek dam, is purer than any of the above waters, at Philadelphia or London, which are employed by millions of people with safety.

\*          \*          \*          \*          \*          \*          \*

"It therefore follows from all the above facts,

"1. That the water of Mill creek, where it enters the Pottsville Water Company's pipe, is one of the purest waters used for drinking purposes and for steam-boilers, by reason of its extremely small content of solid matter per gallon, and of the composition of that matter.

"2. That the colliery works and waters of the New Boston Coal Mining Company do not in the slightest degree injure, or even appear in any way to affect, the waters of Mill creek;

because the water is purer, where it is tapped by the Pottsville Water Company, than it is above the colliery.

"3. That the evidence, deducible from the analysis, is, that the waters of Mill creek are improved rather than deteriorated by the colliery, because they become better and purer from the point where the colliery waters enter the creek."

The court (Ryon, P. J.), on the 10th of September 1866, "decreed that a writ of special injunction shall be issued, to restrain the defendants from causing or permitting the water taken from their slope to flow into Mill creek at any point above the dam of the complainants on the Broad Mountain, and also to restrain the defendants from depositing coal, coal-dirt, slate and other debris, so that the falling rains or other washings thereof shall cause the same to be carried into Mill creek, at any point above the said dam of complainants.

"Said injunction to remain in full force until hearing, or until said defendants shall well and sufficiently lay a line of water-pipes for the use of said company, to be connected with the pipes of said company at said dam, and extending from thence upwards so as to receive and collect therein all the water that may flow into Mill creek and its tributaries above said dam, and above the point opposite the slope of the defendants, or so much thereof as said company may desire to collect in said pipes, the work of said extension and laying of the water-pipes aforesaid to be done under the supervision of the said complainants."

The defendants appealed. The errors assigned were to the decree of the court.

*E. K. Price*, for appellants.—The power of review given to the Supreme Court by Act of June 16th 1836, § 1, Purd. 928, pl. 19, Pamph. L. 785, is a large power, and to be liberally construed: Chase *v.* Miller, 5 Wright 411; Thomas *v.* Brady, 10 Barr 169; Thomas *v.* The Northern Liberties, 1 Harris 117. The expenditures of defendants have been $250,000, and their land is worth $1,000,000. The capital of the plaintiffs is $130,000. Mill creek is the natural drainage of all the defendants' lands, as well as others higher up the stream.

If this injunction can be maintained, the plaintiffs can take the defendants' property without compensation; they take away the profits of the land, which are equivalent to the freehold title;: Carlisle *v.* Cannon, 3 Rawle 489; Miller *v.* Casselberry, 11 Wright 376; Sch. Nav. Co. *v.* Moore, 2 Id. 477, 491. The owner of land has the incidental right to the watercourse, the water and its channel for drainage. Where the country is valuable only for minerals, it becomes a *necessity* that the channels below the openings of the mines become the channels to carry down mine waters. Any appropriation injurious to another

may be resisted: Bealey *v.* Shaw, 6 East 208; Sanders *v.* Norman, 1 B. & Ad. 258. The right of the watercourse and its drainage are part of the estate itself: Wood *v.* Wand, 3 Exch. 748; Taylor *v.* Wilkinson, 4 Mason's Rep.; Bainbridge on Mines 101, 102. The greater convenience is to be subserved: Flanagan *v.* The City of Philadelphia, 6 Wright 219; Monongahela Bridge Co. *v.* Kirk, 10 Id. 112, 130; Gardner *v.* Village of Newburg, 2 Johns. Ch. R. 162; Bonaparte *v.* The Camden and Amboy Railroad Co., 1 Bald. 206; Registrum Brevium 252; Fitzherbert N. B. 225, 510, 515; Callis on Sewers 93–94; Attorney-General *v.* Brittain, 6 B. & C. 519. Private corporations have only the powers expressly granted: Penna. Railroad *v.* Canal Commissioners, 9 Harris 22. The Water Company was not a riparian owner, and they knew that Mill creek drained the water from the defendants' mines when they constructed the works: Rex *v.* Neville, Peake's Cases 91. If the Water Company's charter had authorized them to infringe the defendants' rights, compensation would have been provided: Commonwealth *v.* Snyder, 2 Watts 418; Sch. Nav. Co. *v.* Loose, 7 Harris 15; 3 Rep. 13, 85; 2 Int. 56, 301, 280; Magna Charta, Art. 9, § 11, L. p. 18, Hob. 98; The Queen *v.* Eastern Counties Railway Co., 2 Q. B. 347; Pickford *v.* Grand Junction Railway Co., 10 M. & W. 415; Bell *v.* Hull and Selby Railway Co., 6 Id. 699; Sun. and Erie Railroad *v.* Hummell, 3 Casey 104; Lehigh Valley Railroad *v.* Trone, 4 Id. 207; Lehigh Bridge Co. *v.* Lehigh Coal and Nav. Co., 4 Rawle 23; Sch. Nav. Co. *v.* Loose, 7 Harris 16; Reg. *v.* The Recorder of Manchester, 5 Eng. Law & Eq. 355; Barclay Railroad *v.* Ingham, 12 Casey 202; Sun. and Erie Railroad *v.* Hummell, 3 Id. 99; Watson *v.* Pitts. and Conn. Railroad, 4 Wright 480.

It is not enough to *apprehend* an injurious flow of mine water: Elmhirst *v.* Spencer, 2 Mac. & G. 45; Wood *v.* Waud, 3 Exch. 748; Woolrych on Water 178.

There was no nuisance before the Act of 1854; if it is a nuisance since, the Water Company have made it so. This is a question of fact for a jury: Attorney-General *v.* Cleaver, 18 Ves. 218; Birmingham Canal Co. *v.* Lloyd, 18 Id. 515; Robinson *v.* Byron, 2 Cox 4; Attorney-General *v.* Utica Ins. Co., 2 Johns. Ch. 383; Beaufort *v.* Morris, 2 Phillips 683; 6 Hare 340; Gilder *v.* Merwin, 6 Wh. 541; Commonwealth *v.* Bank of Penna., 3 W. & S. 184; Hagner *v.* Heyberger, 7 Id. 104; Mayor *v.* Commissioners, &c., 7 Barr 348, 366; Fishmongers' Co. *v.* East India Co., 1 Dick. 164; 2 Eden on Inj. 269, 274; Drewry on Inj. 248; 3 Dan. Ch. Pr. 321; 2 Story's Eq. § 925; Ripon *v.* Hobart, 3 My. & K. 169. It is only when a thing has become a nuisance that it can be restrained by injunction: Heilman *v.* Union Canal, 1 Wright 103; Adams's Eq.

485; Fonbl. Eq. 51; White *v.* Booth, 7 Vt. 131; Shields *v.* Arndt, 3 Green's Ch. 234; Caldwell *v.* Knott, 10 Yerger 209; Kart *v.* Mayor of Albany, 3 Paige 213; Reid *v.* Gifford, 6 Johns. Ch. 19; Biddle *v.* Ash, 2 Ash. 211; Gardner *v.* Newburg, 2 Johns. Ch. 164; Van Bergen *v.* Van Bergen, 3 Id. 286; Rhea *v.* Forsyth, 1 Wright 506. A chancellor will not stay the working of a colliery except where there is a breach of an express covenant, or an uncontroverted mischief: Ambler 209; Bainbridge on Mines 310; Sheppard *v.* Oxenford, 25 Law Times R. 90; Brightly's Eq. 176.

*F. B. Gowen* and *F. W. Hughes*, for appellees.—The Water Company had a right to the water of Mill creek which flowed into their dam. Their right was more than an inferior riparian owner: Kauffman *v.* Gieserner, 3 Casey 413; Martin *v.* Riddle, Id. 417. When their right was invaded, there is no question as to *amount* of damages, but only as to the *right:* Commonwealth *v.* Pitts. & Conn. Railroad, 12 Harris 139. The mining company has a right to remove the mine water, but not so as to corrupt the stream on an inferior owner: Howell *v.* McCoy, 3 Rawle 256; Commonwealth *v.* Lyons, 3 Law Jour. 167. Courts of equity will restrain private as well as public nuisances: 2 Story's Eq. §§ 926, 927, 982. The corruption of the water is also a public nuisance, and the Water Company has the duty in this respect of protecting the public rights: Harrisburg *v.* Crangle, 3 W. & S. 460; Devoe *v.* Penrose Ferry Bridge, 3 Wall. Jr.; McCallum *v.* Germantown Water Co., *ante,* p. 40; Wheatley *v.* Chrisman, 12 Harris 298; Rogers on Mines 494; Magor *v.* Chadwick, 11 Ad. & E. 571; Wood *v.* Sutcliffe, 8 Eng. Law & Eq. 217; 2 Johns. Ch. 162; Goldsmith *v.* Tunbridge Wells Commissioners, 35 L. J. R. 82, Eq. Cases; Wood *v.* Waud, 3 Exch. 748; Holscomb *v.* Boiling Springs Bleaching Co., 1 McCarty Ch. R. 335; Spokes *v.* Banbury Board of Health, L. J. R., Eq. Ser. 41, Jan. 1866.

The mining company have not a right by artificial means to create a drainage: Martin *v.* Riddle, 2 Casey 415. The water company has a right from the Commonwealth to take the whole volume of water.

*Meredith,* for appellants, in reply.—The act allowing appeals on preliminary injunctions conforms them to the English practice. Court will never stop an open mine unless compelled: Ambler 209; Hilton *v.* Gromby, Craig & Phillips 284.

The complainants are in this dilemma. They have brought their bill too late, or asked for a preliminary injunction too early.

There are two grounds for injunction: 1. Threat of doing an unlawful act. The complainants were bound to file their bill as

soon as they knew the mine was to be opened; but they have lain by and seen the company build works and erect extensive machinery, and therefore they are too late with their bill.

2. If the working be not *a present nuisance*, a moderate working must be allowed until the nuisance is appreciable: Earl of Rippon *v.* Hobart, 1 Cooper's Select Cases 337.

There are two peculiarities in this case. It is real estate whose only possible use is mining coal. Coal cannot be mined without pumping mine water, and the drainage *must* go into the creek.

The complainants are not riparian owners. A stranger has not the same right to a stream as a riparian owner. A stranger cannot get to it without trespass. The company are to collect the water and sell it; they have fouled all the other water: Rogers on Mines 494, 495; Weeks *v.* Howard, 10 Weekly Rep. 557. One used water for plants; a man above fouled the water, and the other brought his bill: it was held that he could not maintain it because he was not a riparian owner.

The opinion of the court was delivered, February 18th 1867, by

THOMPSON, J.—This case is here on appeal by the defendants, from an order or decree of the Court of Common Pleas, granting a preliminary injunction against them to restrain them from pumping the water from their mines, and permitting it to flow into Mill creek, above the dam of the complainants, whence they mainly derive a supply of water for the purposes of their corporation, and also to restrain them from depositing coal, coal-dirt, slate or other *debris* of their mine in such a position as that it may be subject to be carried into the said stream by rains above this dam.

The only question before us is, whether the injunction was properly or improvidently granted at the time it was granted. It must stand or fall according to the merits which it possessed at the time it was granted: 17 Sim. 15; Hilliard 8.

The case is not at all before us on the merits of the controversy, but only whether such a state of fact was shown to the court as justified it, according to chancery practice, to stop the works of the defendants, and order them to stand still until the subject of the dispute should be finally adjudicated. In all cases this is a high exercise of power, and should be very cautiously exercised; but in a case where large and expensive works are sought to be stopped, not on account of direct or wilful encroachments, but for something incident to a lawful employment, it should be made clearly to appear that it is a case for equitable intervention; that there is no adequate remedy at law, and that if not enjoined, irreparable injury or mischief will ensue to the party complainant. It is an appeal, say the books, to the extraordinary power of the court, and the plaintiff is always bound to make out a case

[New Boston Coal and Mining Co. *v.* Pottsville Water Co.]

showing a clear necessity for it—a necessity in the light of inability to be compensated for the wrong which would ensue if not exercised. The affidavits read by the plaintiffs on the motion did not show, we think, such a condition of things as left the chancellor scarcely an option, in view of the clear justice of the plaintiffs' case, but to restrain the defendants. They were very far short of this. The complaint was, that the defendants were polluting or deleteriously affecting the water in Mill creek, by pumping water from their mines, and permitting it to run into it. The ground for the complaint was, that the plaintiffs had a right, by virtue of their act of incorporation, to the water of the stream for the supply of water to Pottsville and other places mentioned, in its native purity, and free from contamination by mine-water. The defendants claimed that their property embraced the stream, and the stream might be used by them on the premises to carry off their surplus water, and especially as no other possible outlet existed; and furthermore, that they had expended very large sums of money, about $250,000, in opening their mine, erecting machinery, making various improvements, &c., &c., besides the cost of the property; that the expense of the works had been incurred without notice or complaint from the plaintiffs. The plaintiffs, however, allege that they did at one time give notice of objection to the manner of opening the mine. Be this as it may, it was not very material in the stage of the proceedings when the injunction was granted; for whether it should be granted or not would depend upon whether there was a clear right to intervene on the part of the plaintiffs; and secondly, whether it was necessary to grant the injunction in order to prevent irreparable injury or mischief.

We have carefully examined the affidavits read by plaintiffs on the hearing for the preliminary injunction, and while it is probable water near the mines was more or less affected, according to the chemical analysis employed, on the water from the mines, it was but slightly so, if at all, at the plaintiffs' dam. Above the mine the water in the stream showed 1.66 grains to the gallon, silicious and organic matter. This we learn is very pure water. Below and near the new slope it showed 6.39 grains to the gallon of sulphate of iron, lime and carbonaceous matter. At the dam, five miles below, the plaintiffs did not show the state and condition of the water, yet there was proof on that point. Booth & Garrett, the chemists employed, certified to the purity of the water analyzed by them, and taken, as they say, out of Wolf creek, and found it very pure, exhibiting 1.40 grains of organic matter to the gallon. But the witness who procured the water swears it was taken from the plaintiffs' dam on Mill creek. If true, it would show that the water at the point material to the plaintiffs was not affected by the mines. Another item of proof

[New Boston Coal and Mining Co. v. Pottsville Water Co.]

on the point was the existence of fish in the dam, a thing not to be seen in the Schuylkill, it is said, in the neighborhood of mines.

Upon this showing, a case for preliminary injunction for injury being done had not accrued. Nor do we think the anticipated injury to the water was so imminent as to require action before final hearing, and the stoppage of the defendants' works, which would result in great damage to one or other of the parties. The water may become materially deleteriously affected by the mine, and it may become the duty of the courts to interfere in some way that will be just and equitable to all parties, but about that we forbear to express any opinion. We only decide at this time that the measure adopted was not required or provident under the circumstances. The defendants' answer is in, and was so when the injunction was granted, and denies the equity of the plaintiffs' bill, as also the special grounds for interference. Although this is a matter to be considered in granting an injunction, yet we decide on the plaintiffs' case against the injunction, and we must reverse the order for it.

> And now, to wit, February 14th 1867, the order or decree for special injunction in this case is reversed and set aside, together with the writ of injunction, at the costs of the appellee.

READ, J., dissented.